<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TORMU E. PRALL, : <br> : <br> Petitioner, : <br> : <br> v. : <br> : <br> THE ATTORNEY GENERAL OF THE : <br> STATE OF NEW JERSEY, et al., : <br> : <br> Respondents. : <br> : | Case No. 3:18-cv-2614 (BRM) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Petitioner Tormu E. Prall ("Petitioner"), an individual currently confined at New Jersey State Prison, in Trenton, New Jersey, filed the instant Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) For the reasons expressed below, this Court will deny the Petition and deny a certificate of appealability.

**I.     BACKGROUND**

On September 2013, Petitioner was "charged with and convicted of the arson murder of his brother, John Prall [], and the attempted murder of John's girlfriend, Kimberly Meadows." *State v. Prall*, 177 A.3d 755, 757 (N.J. 2018). This Court, affording the state court's factual determinations the appropriate deference, *see* 28 U.S.C. § 2254(e)(1)[1], will recount salient

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

portions of the recitation of facts as set forth by New Jersey Supreme Court, in its opinion on direct appeal:

> John moved into his late mother's house in Trenton (the Trenton home), where [Petitioner] also lived and where [Petitioner's] girlfriend, Jessie, stayed four to five times per week. At that time, the utilities were turned off at the Trenton home for nonpayment; they were restored when John satisfied the outstanding utility bills.
>
> About two weeks after John moved in with [Petitioner] and one week before the fire, John and [Petitioner] argued about [Petitioner's] failure to contribute to the bills and engaged in a physical altercation. The Friday before the fire, John prevented Jessie and [Petitioner] from entering the Trenton home, and [Petitioner] and John argued again about the bills. Jessie persuaded defendant to leave with her and stay at her house that night.
>
> The following morning, Jessie drove [Petitioner] back to the Trenton home. Kimberly was there visiting John. Kimberly testified that she heard the two argue again about the bills, and heard [Petitioner] tell John, "you food, you food," before a physical altercation broke out between the brothers. During the argument, Jessie was waiting in the car in front of the Trenton home. She testified that as defendant exited the home he yelled to John, "you're going to die, you're going to die, you're going to die." Jessie then took defendant back to her house.
>
> That night, at around 7:30 p.m., [Petitioner] asked Jessie to return him to the Trenton home. Jessie did so and, while waiting in the car, heard yelling from inside. [Petitioner] then returned to the car "with a gas can in his hand" and said, "I'm going to set the mo**erfu**er on fire. Would you take me to the gas station so I can get some gas?" Jessie declined and, while driving [Petitioner] to her house, [Petitioner] yelled, "f**k him, I'm going to kill him." At Jessie's house, [Petitioner] continued to talk about John, stating that "Cain killed Abel and [I'm] going to kill [my] brother."
>
> Two days later, in the morning, [Petitioner] was at Jessie's house when she left for work as a school bus driver; [Petitioner] was not there when Jessie completed her route and returned home. Jessie testified that [Petitioner] returned to her house around one o'clock in the afternoon and told her that he had just come from town, where he had argued again with his brother and, in front of many people, said he was going to kill him.

2

That incident was corroborated by Kimberly, who testified that John had taken her to a bank in downtown Trenton that morning and "h[ad] words" there with his brother. Kimberly heard [Petitioner] tell John, "you's a dead man, you dead, you food, you food" and "you are going to die tonight." As John and Kimberly walked away, [Petitioner] followed, still trying to argue and calling John a "dead man."

Later that same day, Jessie took [Petitioner] into town again and returned to work to complete her afternoon bus route. After completing her afternoon route, Jessie located defendant in North Trenton. When she found him, [Petitioner] was "still kind of upset." Shortly after returning to Jessie's house, [Petitioner] fell asleep. Jessie then left to pick up her children from a movie and took them to another house she owned, where she stayed that evening. When Jessie left [Petitioner], he was wearing a yellow T-shirt.

Kimberly testified that she and John fell asleep that night. An unknown amount of time went by before she "started feeling something . . . hot on [her] right side." Laying on her side she asked John, "[W]hy do you feel so hot?" She then rolled over to find John on fire from his waist up. Kimberly noticed that her own legs were also on fire. When Kimberly awakened John, he began "hollering and screaming saying oh, my God. My brother, my brother." Kimberly and John were able to exit the Trenton home. An ambulance arrived shortly thereafter and transported them to a hospital. Both were later transferred to the burn unit at Temple University Hospital. John died four days later.

. . .

During the search of the Trenton home, a trained dog alerted officers to the presence of ignitable liquids in the second-floor front bedroom, where John and Kimberly had been sleeping. A red gas can, a BIC lighter, matches, and a can of WD-40 oil were located in the second-floor rear bedroom. At trial, Jessie identified the red gas can as the one [Petitioner] had retrieved from the Trenton home two days before the fatal fire. A qualified expert in K-9 handling, fire investigation, and accelerant detection testified at trial that the fire was incendiary, intentionally set, and fueled by an accelerant. He further determined that the fire had two points of origin: the second-floor doorway leading into the front bedroom and the mattress in the same bedroom.

Paul Bethea, a City of Trenton sanitation worker, testified that he personally witnessed the argument between John and [Petitioner] in front of the downtown bank on the Saturday before the fire. Bethea also testified that, on the morning of the fire, he drove by the scene on his way to work and saw [Petitioner] standing on a nearby corner "staring

> at the fire." Bethea stated that he then went into the work-yard to prepare his truck for the day, which took approximately twenty minutes; after he left the work-yard, [Petitioner] was still "staring at the fire."
>
> Based on the information gathered during the investigation, detectives filed charges against [Petitioner] and issued a warrant for his arrest. Almost a year later, defendant was located in Connecticut. After returning [Petitioner] to New Jersey, a detective noticed and photographed "severe burns to [Petitioner's] hands." Detectives also learned from Jessie and others that approximately one month before the fire, [Petitioner] threatened to burn down both of Jessie's houses when she attempted to end their relationship. As a result, Jessie obtained a restraining order against [Petitioner]. Jessie also admitted the following: after the fire, she found the yellow Tshirt [Petitioner] wore on the night of the fire; the T-shirt had dried blood and skin on it; and she discarded the T-shirt out of fear of defendant.

*Prall*, 177 A.3d at 758-59. The Mercer County Grand Jury returned an indictment charging Petitioner with first-degree felony murder, a violation of N.J.S.A. § 2C:11-3(a)(3) (count one); first-degree murder, a violation of N.J.S.A. § 2C:11-3(a)(2) (count two); second-degree aggravated arson, a violation of N.J.S.A. § 2C:17-1(a)(1) (count three); and first-degree attempted murder, a violation of N.J.S.A. § 2C:11-3 and N.J.S.A. § 2C:5-1 (count four). *Id.* at 759-60.

On January 31, 2013, petitioner was convicted on all four counts. (ECF No. 18-5.) On May 29, 2013, after merging counts one and three into count two, Petitioner was sentenced to an aggregate custodial term of life in prison plus twenty years subject to the No Early Release Act, N.J.S.A. § 2C:43-7.2, eighty-five percent parole disqualifier. (*See id.*; *see also State v. Prall*, No. A-6048-12T1, 2015 WL 11438112, at *1 (N.J. Super. Ct. App. Div. Aug. 12, 2016.))

On September 2, 2014, Petitioner filed a counseled Notice of Appeal with the Appellate Division raising the following claims:

> 1. The trial judge should have granted Petitioner's motion to suppress the photos that were taken of his hands, and any testimony based upon those photos, as the fruits of an interrogation procedure that

4

>
> the state conceded was unconstitutional in light of a violation of *State v. Sanchez*;
>
> 2. The trial judge improperly reversed the trial court's own ruling and admitted damaging, unduly prejudicial "other crimes" evidence that Petitioner had previously threatened to burn down a witness' home; he also neglected to give any limiting instruction on that evidence, in direct violation of established case law;
>
> 3. The manner in which the court handled the clearly improper testimony that the homicide victim theorized out loud, over and over, that it must have been Petitioner who was responsible for the setting of the fire was too little too late, and thereby unduly prejudiced the jury's view of the case.

(*See* ECF No. 18-6; *see also Prall*, 2015 WL 11438112, at *1.) On October 16, 2014, Petitioner filed a *pro se* supplemental brief raising the following additional claims raising thirty additionally claims. (*See* ECF No. 18-7.) Among those additional claims, Petitioner raised the following claims relevant to the Petition at issue here:

> POINT IV- Destruction of exculpatory evidence.
>
> POINT V- The trial judge arbitrarily restricted defense counsel's cross examination.
>
> POINT IX- Testimony about the t-shirt was inadmissible and violative of the court's prior order.
>
> POINT X- Rules of evidence barred admission of the photographs
>
> POINT XI- The trial judge prevented petitioner from presenting evidence.
>
> POINT XII- The state failed to establish the confession was voluntary.
>
> POINT XIV- Testimony offered lacked particularized guarantees of trustworthiness.
>
> POINT XVII- Misconduct by the prosecutors was reprehensible.
>
> POINT XX- The prosecution suppressed and concocted evidence.

> POINT XXII-Petitioner was subjected to cruel and unusual punishment.
>
> POINT XXIII- Defense counsel was ineffective.

(*See* ECF No. 18-7.)

On August 12, 2016, the Superior Court of New Jersey, Appellate Division, reversed Petitioner's conviction based on the second and third claims in Petitioner's counseled appellate brief. *Prall*, 2015 WL 11438112. The Appellate Division summarily denied all arguments made in Petitioner's *pro se* brief as meritless. *Id.* at *2; N.J. Ct. R. 2:11-3(e)(2). The State filed a petition for certification to the New Jersey Supreme Court and the court reversed the Appellate Division's decision and reinstated Petitioner's convictions. *Prall*, 177 A.3d 755.

On February 23, 2018, Petitioner filed the instant Petition raising the following grounds for relief:

> Ground One: Petitioner was denied access to pre-trial letters to him from state witnesses which attested to his innocence.
>
> Ground Two: Various "outrageous government conduct," which includes:
>
> - Prosecution "doctored" six photographs of Petitioner to appear he had fire scarred lips and hands when he was arrested, even though state witnesses testified he did not have such injuries during his interviews
> - Admission of testimony from State's witness Jessie Harley, Petitioner's girlfriend at the time of the fire, regarding Harley finding Petitioner's yellow tee shirt in her house after the fire with what appeared to be dried blood and skin on it
> - Admission of testimony from Harley that Petitioner did not have a cell phone and was jobless at the time of the fire
> - Admission of testimony from Harley about Petitioner wanting to kill his brother using gasoline
> - Prosecutor's summation comments regarding Petitioner not being seen or heard from again by family or friends after the fire and Petitioner not attending his brother's funeral

- Prosecution's theory that Petitioner murdered his brother because he was angry about being asked to contribute to utility bills for the household

Ground Three: Officers used excessive force to extort a statement from Petitioner about the crimes

Ground Four: Trial counsel was ineffective for failing to challenge two voicemails played at trial and failing to challenge Petitioner's extradition from Connecticut to New Jersey as improper.

(ECF No. 1 ¶ 12.) These claims were raised in Petitioner's pro se supplemental brief to the Appellate Division. On August 3, 2018, Respondents filed a motion to dismiss arguing Petitioner's claims were unexhausted. (ECF No. 8.) Petitioner filed his response on August 15, 2018. (ECF No. 9.) On March 29, 2019, the Court found Petitioner's claims were unexhausted, noting although Petitioner had raised these claims in his *pro se* supplemental brief to the Appellate Division, he failed to file a cross-petition for certification with the New Jersey Supreme Court raising any of his claims. (ECF No. 11 at 4.) The Court granted Petitioner forty-five days to file motion to stay so he could exhaust his claims in state court. (*Id.* at 7.) On April 11, 2019, Petitioner filed a request to file a notice of petition for certification with the New Jersey Supreme Court *nunc pro tunc*. (ECF No. 18-17.) On September 10, 2019, the New Jersey Supreme Court denied Petitioner's motion for leave to file a notice of petition for certification as within time. *State v. Prall*, 216 A.3d 967 (N.J. 2019). Respondents filed an answer to Petitioner's petition for writ of habeas corpus and assert that petitioner's claims are now procedurally defaulted. The Court agrees.

## II.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may not grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the petitioner has exhausted the remedies available in the courts of the State or exhaustion is excused under 28 U.S.C. § 2254(b)(1)(B). *See Henderson v. Frank*, 155 F.3d 159, 164 (3d Cir. 1998); *Lambert v. Blackwell*,

7

134 F.3d 506, 513 (3d Cir. 1997); *Toulson v. Beyer*, 987 F.2d 984 (3d Cir. 1993). To satisfy the exhaustion requirement, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "The burden is on the habeas petitioner to prove exhaustion." *DeFoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005). The exhaustion doctrine mandates the claim "must have been 'fairly presented' to the state courts." *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). "Fair presentation means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010) (citations and internal quotation marks omitted). The petitioner must afford the state courts "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." *Id.* (quoting *Zicarelli v. Gray*, 543 F.2d 466, 472 (3d Cir. 1976)); *see also Gould v. Ricci*, No. 10-1399, 2011 WL 6756920, at *2 (D.N.J. Dec. 19, 2011) (explaining same). The exhaustion doctrine therefore requires a petitioner challenging a New Jersey conviction under § 2254 to have fairly presented each federal ground that is raised in the petition to all three levels of the New Jersey courts—that is, the Law Division, the Appellate Division, and the New Jersey Supreme Court. See *O'Sullivan*, 526 U.S. 838; *Rose v. Lundy*, 455 U.S. 509 (1982).

There are exceptions to the exhaustion requirement. *See* 28 U.S.C. § 2254(b)(1)(B) (exhaustion is excused if "there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant.") If a petitioner is barred by state procedural rules from seeking further relief in state courts. "the exhaustion requirement is satisfied because there is 'an absence of available State corrective

8

process.' 28 U.S.C. § 2254(b)." *Lines v. Larkin*, 208 F.3d 153, 160 (3d Cir. 2000) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999). "We do not excuse exhaustion in this context unless state law clearly forecloses state court review of claims which have not previously been presented to a state court." *Id.* at 163 (quoting *Toulson v. Beyer*, 987 F.2d 984, 988-989 (3d Cir. 1993)).

The doctrine of procedural default bars a federal habeas court from considering a petitioner's claims if the state court refused to address the claims due to a violation of state procedural rules. *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004) (quoting *Harris v. Reed*, 489 U.S. 255 (1989)). A procedural default must rest on "adequate and independent" state law grounds. *Id.* (citing *Harris*, 489 U.S. at 262.) A court has relied on an independent state law ground if the decision was independent of the merits of a petitioner's federal claims." *Id.* at 557.

A state law ground is adequate to support a procedural bar if the procedural rule barring the claim is strictly or regularly followed. *Id.* at 558-59. "[A] discretionary rule can be "firmly established" and "regularly followed"—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

### III. DISCUSSION

Respondents contend Petitioner's habeas claims are procedurally defaulted because they were denied by the New Jersey Supreme Court on procedural grounds. (ECF No. 18 at 10.) As explained above, all four of Petitioner's claims in his petition were raised in some respect in Petitioner's *pro se* supplemental petition on direct appeal to the Appellate Division. (*See* ECF No. 18-7.) On August 12, 2016, the Appellate Division summarily rejected the claims as meritless. *Prall*, 2015 WL 11438112 at *2; *see* N.J. Ct. R. 2:11-3(e)(2). Petitioner failed to file a cross-

9

petition for certification with the New Jersey Supreme Court. Instead, Petitioner filed a motion for leave to file a petition for certification *nunc pro tunc* on April 11, 2019, over two-and-one-half years after the Appellate Division dismissed his claims. (*See* ECF No. 18-17.) The New Jersey Supreme Court denied Petitioner's motion to file a petition as within time and dismissed his appeal. (ECF No. 18-19.)

As explained above, procedural default occurs where "a state court declined to address a prisoner's federal claims because the prisoner failed to meet a state procedural requirement." *Lark v. Sec'y Pa. Dep't of Corrs.*, 645 F.3d 596, 611 (3d Cir. 2011) (quoting *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)). In other words, where the state court dismissed petitioner's federal claims pursuant to an "independent" and "adequate" state procedural ground, federal habeas corpus review is not available. *See id.* The Third Circuit has explained "that an adequate procedural ground is predicated on procedural rules that speak in unmistakable terms." *Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir. 1999).

Petitioner's motion to file a petition for certification *nunc pro tunc* was denied by the New Jersey Supreme Court. (ECF No. 18-19.) Petitioner's application to the New Jersey Supreme Court was filed well outside of the twenty-day limit for filing a petition for certification, N.J. Ct. R. 2:12-3(a), over two-and-one-half years from the entry of the Appellate Division's decision dismissing his *pro se* claims. (*See* ECF No. 18-17.) The New Jersey Supreme Court rejected Petitioner's untimely application. As explained above, in New Jersey to exhaust for § 2254 purposes, a Petitioner must fairly present the claim to all three levels of the New Jersey courts—that is, the Law Division, the Appellate Division, and the New Jersey Supreme Court. See *O'Sullivan*, 526 U.S. 838; *Rose v. Lundy*, 455 U.S. 509 (1982). The New Jersey Supreme Court has now foreclosed Petitioner's ability to exhaust his claim based on the New Jersey's timely filing requirements. (*See*

10

ECF No. 18-19; *see also* N.J. Ct. R. 2:12-3(a).) The New Jersey Court's timely filing requirements are an "independent and adequate" state law ground, thus, Petitioner's four claims in his petition have been procedurally defaulted.

Petitioner would also be foreclosed from raising his claims in a post-conviction relief ("PCR") petition. New Jersey Court Rule 3:22–12(a) requires a defendant to file a petition for PCR within five years of the entry of the judgment or sentence unless the defendant shows that the delay "beyond said time was due to defendant's excusable neglect and that there is a reasonable probability that if the defendant's factual assertions [are] found to be true enforcement of the time bar would result in a fundamental injustice." "The [] time limitation[] shall not be relaxed, except as provided" in Rule 3:22–12. N.J. Ct. R. 3:22–12(c); see R. 1:3–4(c) ("Neither the parties nor the court may [ ] enlarge the time specified by . . . R. 3:22–12."). New Jersey Court Rule 3:21-5 says a judgment is entered when the judgment is "signed by the judge and entered by the clerk. A judgment of conviction shall set forth the plea, the verdict or findings, the adjudication and sentence, a statement of reasons for such sentence, and a statement of credits received." On January 31, 2013, petitioner was convicted on all four counts. (ECF No. 18-5.) Thus, Petitioner had until January 31, 2018 to file a timely PCR petition. Petitioner is now over three years beyond the time for filing a timely PCR petition. The New Jersey Supreme Court has ruled that the time bar should be relaxed only in "exceptional," "compelling," or "extenuating" circumstances. *See, e.g., State v. Sierra*, 2020 WL 4045257, at *2 (N.J. Super. App. Div. 2020) (finding the PCR judge "correctly rejected defendant's contention that the amended [judgment of conviction] controlled the five-year time limitation prescribed by Rule 3:22-12 . . . a PCR petition 'must be filed within five years of entry of the judgment memorializing the conviction even if further trial proceedings relating to the sentence are conducted during the interim period'") *State v. Goodwin*, 173 N.J. 583, 803 A.2d 102,

108 (2002) ("The time bar [under 3:22–12] should be relaxed only under exceptional circumstances . . . . We consistently have recognized the importance of adhering to this procedural bar."); *State v. Marshall*, 173 N.J. 343, 801 A.2d 1142, 1150 (2002) (finding no basis for excusable neglect and barring the PCR petition under Rule 3:22–12) Additionally, the Appellate Division has consistently upheld procedurally defaulted PCR denials pursuant to Rule 3:22-12(a). *See State v. Fleming*, No. A-1432-14T2, 2016 WL 3449249, at *3 (N.J. Super Ct. App. Div. June 24, 2016); *see also State v. Messam*, No. A-0425-13T3, 2015 WL 966027, at *4 (N.J. Super Ct. App. Div. Mar. 6, 2015). The Third Circuit has also found New Jersey court rules such as Rule 3:22-12 to be an independent and adequate ground for procedural default. *Johnson v. Pinchak*, 392 F.3d 551, 562 (3d Cir. 2004) ("From the unambiguous language of Rule 3:22–12 and from the many prior cases that have consistently applied the time bar, it is clear that this procedural rule was an independent and adequate state ground establishing procedural default.").

New Jersey Court Rule 3:22-5 would also preclude review of Petitioner's claim in a now filed PCR petition. New Jersey Court Rule 3:22–5, in pertinent part, bars a ground for PCR relief where there has been a prior adjudication of the ground for relief on the merits "in any post-conviction proceeding brought pursuant to this rule." Here, Petitioner raised his instant claims on direct appeal to the Appellate Division and the Appellate Division rejected his claims. *Prall*, 2015 WL 11438112 at *2. Therefore, Petitioner's claims have been adjudicated on the merits and Petitioner would be barred under New Jersey Court Rule 3:22-5 from raising them in a PCR petition. For these reasons the Court finds Petitioner's claims are procedurally defaulted.

Procedural default of a petitioner's claims may, however, be excused where the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice." *Cristin v. Brennan*, 281 F.3d 404, 412 (3d Cir. 2002) (quoting *Coleman*, 501 U.S. at 750). Petitioner appears to argue that his default should excused because his appellate attorney "refused to file a cross-petition on the claims in the instant petition" with the New Jersey Supreme Court. (ECF No. 1 ¶ 13.)

### A. Cause and Prejudice to Excuse Procedural Default

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless*, 172 F.3d at 260; *Coleman*, 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

13

accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

Petitioner alleges that direct appeal counsel "refused to cross-petition on the claims in the instant petition." (ECF No. 1 ¶ 13.) However, in his request to file a notice of petition for certification with the New Jersey Supreme Court *nunc pro tunc,* Petitioner submitted to the Court that he had given his housing officer an envelope addressed to counsel which contained a *pro se* notice of petition for certification and the officer provided petitioner with a receipt. (ECF No. 18-17 at 1-2.) Petitioner submitted that when he inquired into why the petition was not filed, counsel informed Petitioner that he never received the envelope. (*Id.* at 2.) Petitioner now alleges counsel "refused" to file the petition, which conflicts with the explanation he provided to the New Jersey Supreme Court. Additionally, Petitioner alleged he sent counsel a "*pro se* notice of petition," but fails to explain why he did not just file the *pro se* document with the New Jersey Supreme Court. In order to prove cause, Petitioner must show an external factor prevented him from filing his petition. *Murray*, 477 U.S. at 488. In this case, Petitioner has failed to show something prevented Petitioner from filing his *pro se* notice of petition for certification.

In the absence of cause, the Court does not need to address prejudice. The Court further concludes that the miscarriage of justice exception does not excuse Petitioner's procedural default. Petitioner fails to assert actual innocence to excuse his default and there has been no new reliable evidence of his actual innocence presented to the Court. Accordingly, the Court will deny the instant Petition as procedurally barred from federal habeas review.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As shown by the discussion of Petitioner's claims for habeas relief, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

## V. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

Dated: February 25, 2021

                                                */s/Brian R. Martinotti*
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**